1482, Grumman Aerospace Corporation, and to the Secretary of the Air Force, Mr. Patinsky. Good morning, Your Honors. And please record, I am David Patinsky, and I represent Grumman Aerospace in this appeal. We have raised only two issues. We have raised lengthy trial, and I would like to address the first issue now. And that is what we believe is the Board's erroneous denial of Grumman's superior knowledge claim. And we rest our position on basically undisputed facts, which are in the record and in the documents, Your Honor, that were submitted at trial. At one point in the record, the Air Force comes back to Grumman and says your bid's too low, check it out. And you go back, check it out, and say no, we're sticking with our numbers. Why wasn't that a signal that something's going wrong here? Your Honor, first of all, there's a dispute. Is it very common for that to happen, that the Air Force is going to tell you no, you're off, you're going to begin? Your Honor, there's a dispute about whether or not they actually said to us the bid was too low. In fact, the documents that were submitted to us in that regard said you may have made mistakes in your bid. We'll go back and check. It's the Air Force's position that after they submitted a memorandum to us stating that we may have made mistakes, there was a side meeting where they told us it was too low. But Grumman just denied that. But Your Honor, even had they said that, that doesn't excuse their withholding the basic and vital information that the very software, avionics software, that Grumman was relying on to go forward with this contract, and which it had to in the course of the proposal stage here where it was bidding, it demonstrates to the Air Force that it was going to rely on this prior software in order to do the job for the Air Force. That doesn't excuse the Air Force for telling Grumman... But Your Honor, do you agree that under Elaine Curtis and the many cases that have followed that if the contractor has reason to know that there's a problem, that the contractor has a duty of inquiry, right? Well, yes, Your Honor, if it has reason to know about the specific problem, not just where the very software which Grumman was relying on properly to go forward with this bid was defective and flawed, the Air Force knew it, the only other bidder, General Dynamics knew it, and no one told Grumman. And it happened, it was so seriously flawed... But also Grumman didn't answer, right? That's correct. But the Air Force told Grumman that the very program schedule that Grumman was relying on to go forward here and to base its bid on, to know that that software would be tested and mature, that that schedule was no longer relevant, and that they were... I looked at the testimony, where is their testimony that they were relying on the program schedule? I understand that there was testimony that they were relying on being able to use the General Dynamics software, but the specific schedule, I didn't see testimony that they were relying on a specific schedule. Yes, Your Honor, actually there is testimony in the record that they were relying on the program schedule, and in fact, that was provided, it was provided, how the board goes forward in these cases, with direct testimony in writing, it was provided by the engineering manager for Grumman's proposal, Herman Shank, and he, in his direct testimony in writing, stated that he relied on that program schedule. The 1984 schedule? Yes, that's correct. I didn't see it. Yes, I believe it. By the way, I will come back, I have that testimony. But he did expressly state he relied on that schedule, and the Air Force said it would update information in the data library as it became available from General Dynamics. That was an affirmative representation the Air Force made. Then, when it found out that the predecessor software was so flawed that it had to give a cure notice to General Dynamics, which was the only other bidder, had to give them a cure notice and threaten termination of the contract for default because their software was so flawed. That was the information the Air Force did not provide to Grumman. What you're saying is that the government has to provide every bit of information to the contractor, and even though the contractor is on notice, that's a problem. They had a dinner meeting in which they learned before the contractor signed, they had a dinner meeting in which they were told that there were problems. As Judge Rader points out, they were told their bid was too low. I mean, what do they have to be told before there's a duty to inquire about it? With respect to those two dinner meetings, the first dinner meeting had nothing to do with information. The second dinner meeting did. That's correct. And there was no finding by the board below that that second dinner meeting took place as late as November of 1985 when this information became available to the government. The question before the board about the dates of that meeting was whether or not it was before or after the RFP was issued on January 31, 1985, but there's no finding that that meeting took place as late as November of 1985 when this information became available. So there was no basis back then, back at that earlier time, for the government to even know itself what was happening with this software. We're talking about events that occurred as late as November and December 1985, just before contract award, at the same time that the Air Force, in its own internal evaluation of the Grumman bid, in recommending the Grumman bid be accepted, is saying Grumman is depending upon the availability of this software to do the job, and if it's not available, they're at serious risk, and it's at that time that the Air Force does not tell Grumman what is going on with this prior software. Mr. Patinsky, the contract here has no warranty of information clause. It has an ongoing design clause. Why don't those prejudices recline? Well, for two reasons, Your Honor. The first is a legal matter. The mere fact that the government gives unwarranted information to a bidder doesn't permit it with impunity to thereafter, when it finds information which clearly refutes the information it did provide to the bidder, contradicts and refutes the information it did provide to the bidder. It can't then withhold that information on the grounds that the original information was unwarranted. A lot of the problem, of course, here is that we've got a lot of hindsight. We can look back and see what the difficulties were as it's occurring. It's probably pretty clear General Dynamics isn't making known the complete degree of their failure. Why isn't the Air Force sufficient in the notice it gave to you, as Judge Dyke suggested? According to the knowledge it had, it was sending you some signals. Was it not? Your Honor, I don't think it's fair for the government to rely on sending signals when it's a simple matter to come forward. I'm not so sure that we knew. I'm not so sure that the government knew anymore. Yes, it knew. The government did know, Your Honor. This is why I knew if I met him. The person who wrote the report for the government recommending the acceptance of Rumman's proposal and noting in the report that Rumman was dependent on getting this avionics software from the prior program, that is the same person who was the contracting officer on the General Dynamics FB program and who was very much aware of the fact that that software had failed. That's the same person. The very person who sent the cure notice to General Dynamics in early December 1985 is the person who's writing the report for the Air Force saying, we should accept Rumman's proposal and it's only going to be a failure in the worst-case scenario. The General Dynamics software eventually succeeded in my career. Many years later, yes. How long later? Well, here's the situation. Rumman, based on the program schedule, which the Air Force never updated, was based on that program schedule. The General Dynamics software was scheduled to pass these tests and be technically mature no later than November 1985 before contract award for the contract Rumman was bidding on. It had problems. When was it? Yes. What happened in November 1985, they tried to pass the first of two tests called the PQT test. They can't even complete the test and therefore it's not passed. The second test, the FQT, formal qualification test, that is a test to follow the first test. That second test, and this is the important part, was postponed to start until after flight test on the General Dynamics program, which was not going to start until more than seven months after contract award for the contract Rumman was bidding on. So that you've now taken the very software Rumman was to start working with in the beginning of its program when contract award starts in January 1986. And you have to forget about passing it. You're not going to try to pass it until they start flight test on the other program more than seven months after contract award. So that's what happened. And we say, Your Honor, that when the very person who's writing the report accepting the Rumman proposal and saying it's dependent, they say this expressly, it's dependent on Rumman getting this information and it being available, that's the same person who knew that the software was not available. Is there any case under the Helene Curtis Superior Knowledge Money cases that holds where the government puts right in the contract that we're not warranting the data that a superior knowledge claim is not allowed? Is there such a case? Well, Your Honor, let me ask that question. I do not think there is a specific case in this court that says if the government says we're not warranting data that they can be held for violating the superior knowledge document. But you have plenty of cases that come up in the boards below where a contract was told, Here, you're going to get information and it's going to help you do your job if you bid on this job. And later it turns out that the government knew at the time that it wasn't going to help you. And all I'm saying is if the superior knowledge document is going to have any meaning, you can't let the government escape its obligations by simply saying the information is unwarranted and then when it finds out that what it represented was not true, that it can say with impunity, we're going to let the government go off the hook. You can't do that to a bidder. And don't forget, this is a case where the government had every motivation to do exactly what it did. It only had two bids. It had the Grumman bid at $100 million and it had the General Dynamics bid at $200 million. Mr. Patinsky, all you really had to do was ask one question. What has happened with the General Dynamics software? But, Your Honor, that's true.  That is true, Your Honor. But also, keep in mind that as Mr. Sheng testified, he thought that particularly because you had only one other bidder that was General Dynamics and it's performing the FB test, that the government is going to maintain a level playing field for both bidders. And in fact, the data library, which included this schedule, in that data library narrative, they told the bidders that as we, the Air Force, receive further information about General Dynamics, and we're going to update the information in the data library. They made that representation to the bidders. That as the information comes in from General Dynamics on its program, that's then being performed, they will update the bidders with that knowledge. That's in the data library narrative. That's what they tell the other bidders. I'm still a little troubled that one simple question could have solved this problem. Well, Your Honor, keep in mind now the contest, if I may, please. I know I'm over my time. Here's the contest. You have Grumman being told at RFP, in order to succeed on your bid, you have to make a proposal that's going to show us how you're going to achieve this commonality between the prior Avionics software and the Avionics software we're doing. And so that, Grumman predicates his proposal on that request. Well, that sort of hurts you, doesn't it, in the sense that everybody knew that this commonality was front and center, it was really important. The contract says you can't rely on the data. You would think under those circumstances a prudent contractor would ask repeatedly about what's the status of the General Dynamics Avionics. Well, Your Honor, my answer to that is this. Legally, if you just put aside for a moment, I'll come back to it again. Put aside for a moment the fact that they said it was unwarranted. Legally, it's clear from the superior knowledge cases that you cannot, in this bidding context, the government cannot say that the contractor can be betrayed by its silence and there's no penalty to be paid by the government. The government clearly has the obligation under the superior knowledge document that if it has vital information that it knows is relevant to the bid, it has to share that with the bidder. And it doesn't matter whether the bidder is or doesn't is. That's clear from the cases. The only difference you have here, and I understand that's of concern to you, but the only difference you have here is this statement that we're not warranting the information in the data library. All I can say to you, Your Honor, is this. If you're going to let the government say something's not warranted, and then when it finds out, when it finds out the very information it says is not warranted has been refuted and contradicted by the events known only to it and only of the bidder, then you are really emasculating the superior knowledge document because you're telling the government. All it has to do now is say it's not warranting information. So I say to you, that is not a sufficient excuse. Before you sit down, I know we're exhausting your time, but as far as the damages aspect is concerned, are you relying on your brief? Is there a... Well, if I have a minute or two, I'd like to still reserve that and come back. I think we'd like to hear it. And I'd like to address that briefly. I have a minute to go. And I also have a citation to that testimony. Okay. Thank you, sir. May it please the Court. If there was one word I could add to Drummond's briefs and his argument, it's the word existing. Because the RFP told them that they were going to adapt the software to what was existing in the data library at the time of RFP release. That was the Board's conclusion, and they haven't challenged that on appeal. But the issue that's been raised is that they, even accepting that they knew that there were problems, hadn't been told that it was a failure. Well, it wasn't a failure, Your Honor, but... It certainly didn't meet the time schedule by months. Well, in the latter part of 1985, they did have some problems. But what it doesn't say in Drummond's brief is that General Dynamics did not finish the contract on time. And what it doesn't say is that General Dynamics was terminated for default. Those things did not happen. There were some bumps in the road, but General Dynamics finished their contract on time, unlike Drummond. The reason why it's key, though, that... Even though it didn't pass the test until months after the contract was over? Until months after the new contract? They had not... Right, right. But they knew, going into this, as the board said, and they hadn't appealed it, that this software that was in the library was going to have to undergo extensive laboratory and flight testing. Now, what it comes down to is that Drummond looks at the software. They come to the Air Force and say, we're a sophisticated defense contractor. We have 30 years of experience on weapons systems like this, including extensive software development. They make their proposal to the Air Force, and they say, we have gone to great depth, and this is in the record, to analyze the software in the library, and we have made our own determination as to what we can use, what we can modify, and what's unique. So all along, they were relying on their own business judgment. Now, the extent to which that Drummond decided that they could use the data that was existing in the library or any software that they could get the Air Force to give it in the future was its own business judgment and its own decisions to take on the risk of performance. I think the contractor makes a stronger statement than that, not just saying you can use it if you feel like it, but that you must enhance it. And if it isn't working in the first place, how can it be enhanced? Well, what's in the library, though, is not software code. It's not developed nearly that far along. And what the board found, and what I don't think Drummond challenges, is that their engineering manager acknowledges, and this is in finding of fact five in the board's opinion, again not appealed, that Drummond knew that these procurements were going to be concurrent. If they're going to be concurrent, they're going to be doing the testing and so forth in the same general span of time. It's not complete software. It's software that's only partly developed. So that's why we tell them. We're honest with them. We're giving you what we have in the library, but we make no warranties and that you rely on it at your own risk. Mr. O'Connell, what if the contracting officer in this case had come to you two months before the bid and said, here's my situation. Things are going bad for General Dynamics. Should I talk to Grumman? What would you have suggested? Well, I would have said that it wasn't necessary, Mark, because... Why wouldn't you say to him, there's only two bidders, right? Let's make sure that there's no unfairness here. Well, that... I'll get to the question in a second, but that works both ways because Grumman comes into this knowing that General Dynamics was the original manufacturer of the F-111 fleet. And they come into this knowing that General Dynamics already has this contract to update the FD-111. So Grumman is not a mom-and-pop contractor. They're very sophisticated. And the board's opinion shows very clearly that they were very proactive in gathering information. The problem was that they didn't do it the correct way, which would have been to approach the contracting officer and they tried to do it the other way. But what I would have said to the contracting officer is that, look, you've already told the bidders that this is incomplete data. Use it at your own risk. Both of these companies are... General Dynamics in particular is making this software for General Dynamics to use that Grumman already knows that it's going to need to undergo extensive laboratory and flight testing. General Dynamics isn't making it to try to help Grumman. This is the risk that Grumman knew about. And if they were so concerned about the status of the General Dynamics contract, they would have been asking about it. And, in fact, what we learn in discovery  with somebody behind the contracting officer's back, and they know that there's delays to the General Dynamics contracts. But another point I'd like to make, which I think is relevant to this appeal, is that there's the old saying, actions speak louder than words. Well, here, inactions speak louder than words because we've got Grumman's proposal manager meeting with the Air Force officials. He finds out General Dynamics is delayed. What does he do? He doesn't do anything. He doesn't approach the contracting officer. He doesn't seek to withdraw Grumman's bid. November of 1985, Grumman's engineering manager testifies that they've discovered that there's, quote, a lot of trouble with the software that they're getting. What does he do? He doesn't do anything. He doesn't approach the contracting officer. He doesn't seek to withdraw Grumman's bid. They start performance in 1988. They get a cure notice because they're doing a poor job, because they're using people that aren't experienced in software development. Grumman's president responds to the cure notice by saying, not that Air Force, this is your fault because you gave us late data, you gave us faulty data. No, what he says is that we didn't understand how tough this was going to be, and when we bid this contract, we violated our own software procedures in the interest of expediency. So, I'd like to move on to damages, then, if this would be a good time. I would submit to the court that, in some ways, damages could be viewed as a threshold issue in this case, because, and the reason I say that is because the board made a lot of findings of fact in its damages opinion, and Grumman hasn't appealed any of them. Since none of the board's findings of fact with respect to damages are going to remain in place, there would be nothing to send back to the board even if the court reversed on the superior knowledge claim. But the board said they couldn't make findings of fact, and therefore there are limited damages to the few areas in which they thought they could. Right. How do you square that with the areas in which the board did indeed find that Grumman had been disadvantaged and yet was not compensated in any way? Well, there was an interesting dynamic at this trial, Your Honor, because Grumman came in and said, we're going to do a total cost claim because we can't individually price these claims. So the Air Force came in and said, well, they can individually price a lot of these claims. And so it's actually the defendant that's coming in and submitting damages evidence so that when the board awarded damages, it used evidence that had been submitted by the defendant. But that was Grumman's trial strategy, that they were going to go for the big $50 million claim, do a total cost claim, and not try to give the board evidence of its individual claims. That's their trial strategy. They're stuck with that, and so there's nothing to send back because, as the board said, on the majority of the claims where the board found some liability, at least, Grumman hadn't submitted any evidence of damages. And frankly, they haven't challenged that finding of fact on appeal. When they don't challenge that, I don't think that anything can be sent back to the board. Thank you, and I just obviously ask that the court affirm the board contract with us. Thank you, Mr. Grumman. With the pleasure of the court, if I could just have two or three minutes, I would appreciate it. First, to answer your honest question, the two citations of an engineering manager, Shanks, reliance on the program schedule are A578 and also A536. And I'll try to be very brief, Brian. You've been very involved. The board found that Grumman was entitled to recover 14 of its 29 liability claims, all involved in the same contract. The board expressly felt that it was impractical for Grumman to track and identify the actual cause. So you should be satisfied by that part of the test. But one problem with the test is you have to be evidence sufficient for the board to make a jury verdict. What's the evidence? The evidence, as we stated in our brief, are twofold. One, we say, and remember, this is a jury verdict we're talking about. The board sits in the position of the juror. We say the board's own findings, and their extensive findings, on the 14 liability claims, that is sufficient for it to make a jury verdict. Just liability determination standing alone. Yes, just liability determination standing alone, Ron. Plus, we have something else here. The very basis for the board's decision that it was not practical to discreetly calculate actual damages for each of the claims was part of the Ernst & Young report that was given to the board through the testimony of Dr. Louis Rosen. And that has extensive schedules, extensive schedules showing how there was this concurrency and interactivity among these liabilities that it found to favor Grumman. Now, I admit to you, Ron, there are no specific dollar values attached to those charts where it shows the interactivity and the concurrency. But it has been quite common, quite common for both this court and for boards below, when they have a jury verdict award, and have what the contract is claiming for, and what the government is saying should be zero, to pick a number in between. That's what juries do all the time. And even in the most recent Blue Bonnet case, which Judge Ray was saying, the last Blue Bonnet case, and I think maybe you too, Judge, Blue Bonnet 6, I guess it is, that in that case, you said that the plaintiff could recover, even if he couldn't substantiate his damages. I mean, the whole point of a jury verdict award is to give an award where there's been a fine and a liability, and it's not practical to do a discreet calculation of damages. I mean, that's the purpose of the jury verdict award, where you cannot take numbers and use them in a concrete sense to craft an award. And that's what a jury does. A jury, if a jury were sitting below the board, and the judge said, Robin has succeeded on 14 of his 29 claims, and here are the names of the claims, the jury would make an award. And when you're sitting in a jury verdict award context, this court or the board is no different than a jury. And we've cited in our brief numerous cases where the courts have said, and the boards have said, that where you have the first two prompts in there, clear proof of injury and no ability to do an actual determination of damages, that that's the precise purpose for awarding a jury verdict award. Well, it's not what they said. They've also said there has to be evidence to support an award. Well, yes. But they've never said that that evidence has to be tantamount to the actual calculation. And so here you have Robin asking for $50 million. You have the Air Force, by the way, saying you should get nothing. And the jury would pick a number in between. Now, if I may just, I want to digress just for one moment. We're not asking for a jury verdict award on superior knowledge. If we go back on superior knowledge, we've never had a chance to brief that amount. I just want to make the record clear. Because the board bifurcated briefing. So we never had an opportunity to brief damages on superior knowledge. And our calculation here is entirely different from the jury verdict. Thank you. All rise.